

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,      )
         )
      Respondent,      )
         )
v.          )     No. SC93648
         )
ROBERT BLAKE BLURTON,      )
         )
      Appellant.      )

### APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
The Honorable Larry D. Harman, Judge

### *Opinion issued March 15, 2016*

Robert Blurton appeals his convictions for three counts of murder in the first degree. Mr. Blurton was sentenced to death after being found guilty by a jury for murdering his aunt, uncle, and their 15-year-old granddaughter. On appeal, Mr. Blurton asserts that the trial court erred by refusing his proffered lesser included offense instruction, admitting testimony regarding cell phones and fingerprints, excluding evidence that someone else had the motive and opportunity to commit the murders, excluding bias evidence, and denying mistrial requests. Because this case involves the imposition of the death penalty, this Court has exclusive jurisdiction over the appeal. Mo. Const. art. V, sec. 3.

This Court finds that the trial court did not err in rejecting Mr. Blurton's proffered lesser included offense instruction because the instruction did not properly conform to the MAI requirements. Nor did the trial court err in admitting testimony from the state's cell

phone analyst because his testimony was within the realm of a layperson. The trial court also did not err in admitting testimony from the state's fingerprint analyst because the trial court sustained three of Mr. Blurton's objections and the fourth objection was untimely. The trial court did not err in excluding evidence that someone else had the motive and opportunity to commit the crimes because Mr. Blurton did not attempt to present this evidence at trial. The trial court also did not err in excluding evidence of a witness's alleged bias against a potential witness because the potential witness was not called to testify at trial. Furthermore, the trial court did not err in denying Mr. Blurton's mistrial requests after the state inadvertently displayed crime scene photographs on three occasions because the display of the photographs was not intentional and all of the photographs were later admitted into evidence. Accordingly, this Court affirms Mr. Blurton's convictions and sentences. Additionally, after an independent review of the proportionality of Mr. Blurton's death sentences pursuant to section 565.035,[1] this Court finds that Mr. Blurton's death sentences were not excessive or disproportionate to the penalty imposed in similar cases.

### Factual and Procedural Background

Mr. Blurton's aunt and uncle, Sharon and Donnie Luetjen, and their 15-year-old granddaughter, Taron Luetjen,[2] lived together in Cole Camp. Mr. Blurton had not been to the Luetjens' home in about five years, but he had visited their home as a child and had

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.
[2] Taron lived with the Luetjens after her father, the Luetjens' son, died in a car accident in 1993 when Taron was a few weeks old. The Luetjens were awarded custody rather than Taron's mother. Because Donnie, Sharon, and Taron share the same surname, each will be referred to by his or her first name to avoid confusion. No disrespect is intended.

lived with the Luetjens for a few months in 2004 after he was released from prison. At that time, the Luetjens had helped him buy a vehicle, find a job, and move into a new apartment.

On June 7, 2009, at 10:15 p.m., a 911 call was placed from Taron's cell phone. The operator disconnected the call after the caller did not speak for 45 seconds. A return call from the 911 operator was not answered, and the 911 operator did not dispatch the police. At trial, the state submitted a transcript of the original 911 call, which included the voices in the background of the call:

Dispatcher: Nine One One where is your emergency?

(unintelligible)

Female: Ohhh.

Dispatcher: Nine One One do you have an emergency.

Male: (unintelligible) in place . . . I will kill you.

Dispatcher: Hello?

Female: I have three hundred dollars in my purse.

Male: I heard you. Set right there. Set right there. Sharon, I'll kill all you guys. Set right there. I liked all of you. Give me that other hand.

(unintelligible)

The male voice in the call was identified as Mr. Blurton's by the Luetjens' daughter and Mr. Blurton's girlfriend.[3] A few minutes after the 911 call, at approximately 10:30 p.m.,

---

[3] The Luetjens' daughter testified that she was 80 percent certain that the male voice was Mr. Blurton's when she listened to the original 911 recording. Her certainty increased to 90 percent when she later listened to an enhanced recording that had some of the

a neighbor, who lived less than a half mile across the valley and who often heard sounds coming from the Luetjens' property, heard three pistol shots from the direction of the Luetjens' house.

Two days later, a neighbor discovered the Luetjens' bodies in their home. Each victim was found gagged, lying face-down on a pillow in the living room, with their hands bound behind their backs with brown fabric from Taron's canopy bed. Each had been shot once in the back of the head with a .22 caliber pistol.

Police found no evidence of forced entry. Inside the home, three cups – a white coffee mug, a plastic Royals souvenir cup, and a red travel mug – were found on the living room table. Mr. Blurton's fingerprints and DNA were discovered on the white coffee mug.[4] Mr. Blurton also could not be excluded as a contributor to the DNA found on the brown fabric used to bind Donnie's right hand. The DNA on Sharon's bindings also exhibited male characteristics, but the results were inconclusive as to whether the DNA was consistent with Mr. Blurton's because not enough data could be developed from the DNA that was found. The DNA on the binding on Taron's right hand exhibited male characteristics. Mr. Blurton was excluded as a contributor, but Donnie could not be

---

background noise filtered out. Her certainty increased to 100 percent when she listened to a further enhanced recording prior to trial. When Mr. Blurton's girlfriend listened to the original 911 recording, she did not recognize any voices at first. After listening to the original recording again, she testified she was almost positive she recognized Mr. Blurton's voice and stated, "Oh, my God, I can't believe that's him." When she later listened to the enhanced recording, she testified that there was not any doubt that the voice was Mr. Blurton's.

[4] The DNA profile found on the white coffee cup that was consistent with Mr. Blurton's DNA had a frequency of one in 4.968 quadrillion in the Caucasian population.

excluded. The DNA on the binding on Taron's left hand also exhibited male characteristics, but Mr. Blurton and Donnie were both excluded as contributors.

In addition to the murders, police found evidence of a robbery. Donnie's wallet and its contents were found beneath a pillow on a chair near his body. His wallet contained no money although he was known to carry at least $200. Sharon's purse was sitting on the floor in the hallway near her bedroom. Her wallet had been removed and also did not contain any money.

In the Luetjens' bedroom, a dresser drawer was sitting on their bed with the contents dumped out. The drawer usually contained a large amount of change and Donnie's sizeable arrowhead collection. Only a small amount of change remained, and the arrowheads were missing. Mr. Blurton had been caught stealing change from this drawer when he was a teenager. A gun cabinet in the Luetjens' bedroom was open, and three guns, including two .22 caliber pistols, were missing. Taron's cell phone was also missing.

On June 27, 2009, based on the daughter's identification of Mr. Blurton's voice on the 911 recording and the DNA results linking him to the crime scene, Mr. Blurton was arrested and charged with three counts of murder in the first degree under section 565.020. Prior to his arrest, Mr. Blurton asked his girlfriend to tell the police that he was with her that night. Mr. Blurton lied to her – telling her that he was at his boss's house in Nevada on the night of the murders but was unable to drive home because of severe weather and because his boss's wife was hitting on him. His boss and his boss's wife later testified at trial that Mr. Blurton had never been to their home. Mr. Blurton's

5

girlfriend agreed to tell the police that Mr. Blurton had been with her on the night of the murders but she later recanted, telling the police that Mr. Blurton had asked her to lie for him.

At trial, the state's evidence included cell phone tower evidence showing that Mr. Blurton's cell phone had traveled from Garnett, Kansas, to Cole Camp between 8:16 p.m. and 9:59 p.m. on the night of the murders; the DNA and fingerprint evidence linking Mr. Blurton to the crime scene; and the identification of Mr. Blurton's voice as the male voice in the background of the 911 call. As motive for the robbery and murders, the state presented evidence that Mr. Blurton had recently lost his job and had been asked to move out of the home he had shared with his girlfriend. The girlfriend testified that Mr. Blurton had told her that he owed people money. Moreover, she testified that Mr. Blurton had told her that he would inherit land, a vehicle, and 22 percent of $6.6 million from the Luetjens.

A jury convicted Robert Blurton of three counts of murder in the first degree under section 565.020. At the penalty phase, the state presented evidence of Mr. Blurton's prior conviction for robbery in the first degree, as well as his convictions for forgery, burglary, stealing, and possession of a controlled substance in a department of corrections facility. The state also presented victim impact evidence from the Luetjens' daughter and grandson. Mr. Blurton presented mitigating evidence from his stepmother, two prisoners who were previously incarcerated with him, and a psychologist who testified that it was unlikely that Mr. Blurton would be violent in prison.

6

The jury recommended a sentence of death on all three counts. The jury found the following statutory aggravators: (1) Mr. Blurton had a prior serious assaultive conviction;[5] (2) each murder was committed while he was engaged in the commission of two other murders; and (3) the murders involved depravity of mind and, as a result, the murders were outrageously and wantonly vile, horrible, and inhuman insofar as each victim was bound or otherwise rendered helpless and Mr. Blurton, therefore, exhibited a callous disregard for the sanctity of all human life. The trial court rejected Mr. Blurton's motion for a new trial, accepted the jury's recommendations, and sentenced Mr. Blurton to death for each offense. Mr. Blurton now appeals his convictions.

On appeal, Mr. Blurton asserts that the trial court erred by: (1) rejecting his proffered jury instruction for felony murder in the second degree; (2) allowing a lay witness to testify regarding the location of the cell phone towers to which his cell phone connected on the night of the murders; (3) allowing the state's fingerprint analyst to testify that two other "qualified" examiners had "verified" her fingerprint identifications as part of her crime laboratory's peer review process and that "there weren't any issues"; (4) excluding testimony and argument that Taron's mother had motive and opportunity to commit the murders; (5) excluding evidence that the testimony of Donnie and Sharon's

---

[5] In 1988, Mr. Blurton was convicted of robbery in the first degree and sentenced to 15 years in prison. Under section 569.020, "[a] person commits the offense of robbery in the first degree when he forcibly steals property and . . . [c]auses serious physical injury to any person[,] . . . [i]s armed with a deadly weapon . . . or . . . [u]ses or threatens the immediate use of a dangerous instrument against any person[.]" Robbery in the first degree is "by definition" a serious assaultive conviction even when evidence of the "nature of the assault included in the robbery" is not submitted to the jury insofar as it "involves serious physical injury, a dangerous instrument, or a deadly weapon." *State v. Amrine*, 741 S.W.2d 665, 672 (Mo. banc 1987) (internal quotations and citations omitted); *see also State v. Brooks*, 960 S.W.2d 479, 496 (Mo. banc 1997).

7

daughter was biased; (6) excluding testimony from Donnie and Sharon's friend about threatening telephone calls from Taron's mother and maternal grandmother; and (7) denying mistrial requests three times when the state inadvertently showed witnesses and the jury graphic crime scene photographs of the victims.

## No Error in Rejecting Second Degree Felony Murder Jury Instruction

Mr. Blurton first claims that the trial court erred in refusing to submit his proffered jury instruction for the lesser included offense of second degree felony murder because he met the statutory requirements for giving the instruction. In support of this claim, Mr. Blurton cites this Court's recent decision in *State v. Jackson*, which held that the trial court is obligated to give a "nested" lesser included offense instruction when "a party timely requests the instruction," "there is a basis in the evidence for acquitting the defendant of the charged offense," and "there is a basis in the evidence for convicting the defendant of the lesser included offense for which the instruction is requested." 433 S.W.3d 390, 396 (Mo. banc 2014). The state maintains the instruction was properly rejected because the instruction was not in proper form or, in the alternative, that Mr. Blurton was not prejudiced by the trial court's rejection of the instruction.

Unlike in *Jackson*, Mr. Blurton's offense was not a "nested" lesser included offense, i.e., where the elements of the lesser offense are a subset of the elements of the higher offense. *See Jackson*, 433 S.W.3d at 404. Instead, Mr. Blurton's lesser included offense of second degree felony murder required proof of additional facts from those required to prove the higher offense and was "lesser included" by denomination by statute. *See* section 556.046.1(2); section 565.025.2(1)(a). It is not, however, necessary

to address Mr. Blurton's claim that he was entitled to submission of the lesser included offense of felony murder because a trial court's rejection of a proffered instruction should be affirmed "[i]f the trial court was correct . . . for any reason[.]" *State v. White*, 936 S.W.2d 793, 794 (Mo. banc 1997).

At trial, the state objected to Mr. Blurton's tendered second degree felony murder instruction on the ground that it was not in the proper form, stating that it didn't "believe [the instruction] is in proper form, or has the proper accompanied instructions that are required to be given under the notes on use." The trial court refused to submit the lesser included instruction because "[t]he for[m], which the instruction is tendered, is not the proper [form]."[6] Mr. Blurton did not request to modify his proffered instruction in response to the trial court's ruling.

A trial court does not err by rejecting an improper jury instruction. *State v. Parkhurst*, 845 S.W.2d 31, 37 (Mo. banc 1992); *see also State v. Immekus*, 28 S.W.3d 421, 432-33 (Mo. App. 2000); *State v. Binnington*, 978 S.W.2d 774, 776 (Mo. App. 1998); *State v. Powers*, 913 S.W.2d 138, 142 (Mo. App. 1996); *State v. Colson*, 926 S.W.2d 879, 883 (Mo. App. 1996).

---

[6] The trial court also stated that it was refusing Mr. Blurton's second degree felony murder instruction because the state had not charged Mr. Blurton with the underlying felony of robbery in the second degree, robbery in the second degree was inconsistent with Mr. Blurton's alibi defense, and the facts in evidence did not support a felony murder instruction. Although Mr. Blurton claims these grounds for the trial court ruling were erroneous, it is unnecessary to consider these alleged errors where the trial court's ruling can be affirmed on other grounds. *See White*, 936 S.W.2d at 794.

Mr. Blurton submitted a second degree felony murder instruction that stated:

As to Count [I/II/III], if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

As to Count [I/II/III], if you find and believe from the evidence beyond a reasonable doubt:

First, that after 10:17 PM on the 7th day of June, 2009, at 802 South Elm, Cole Camp, in the County of Benton, State of Missouri, the defendant took property which was owned by Donnie Luetjen and, that defendant did so for the purpose of withholding it from the owner permanently, and that defendant in doing so used physical force on or against [Donnie/Sharon/Taron] for the purpose of preventing resistance to the taking of the property, then you will find that the defendant has committed robbery in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you cannot find that the defendant has committed robbery in the second degree.

Second, that [Donnie/Sharon/Taron] was shot and killed, and

Third, that [Donnie/Sharon/Taron] was killed as a result of the perpetration of that robbery in the second degree,

then you will find the defendant guilty under Count [I/II/III] of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of the propositions, you must find the defendant not guilty of murder in the second degree under this instruction, but you must then consider whether he is guilty of murder in the second degree under Instruction No. ___.

Mr. Blurton requested that the trial court submit this instruction in addition to the instructions for first degree murder and conventional second degree murder proffered by the state. The trial court was correct in its ruling that the instruction was not in the proper form.

The party submitting a second degree felony murder instruction must submit a separate instruction for the underlying felony when the jury is not otherwise instructed to

10

decide the defendant's guilt of the underlying felony. Notes on Use 2(b), MAI-CR 3d 314.06. The separate instruction for the underlying felony must be identical to a verdict director for the underlying felony except that it must be modified to state that the jury must find that the defendant "committed" the felony instead of that the defendant is "guilty" of the felony. *Id.* The first paragraph of the second degree felony murder instruction must then cross-reference the instruction for the underlying felony. *Id.*

In his brief to this Court, Mr. Blurton admitted that he failed to proffer a separate instruction for the underlying felony of robbery in the second degree. As such, Mr. Blurton's proffered jury instruction was in an incorrect form insofar as it violated the Notes on Use for 314.06. The trial court would have erred in giving Mr. Blurton's incorrect jury instruction. *See State v. Livingston*, 801 S.W.2d 344, 348 (Mo. banc 1990) ("The giving of an instruction in violation of the Notes on Use under MAI-CR constitutes error[.]"). Because the trial court is not compelled to give an incorrect instruction and does not err in refusing a flawed instruction, it is not necessary to consider whether his proffered instruction would have prejudicially confused or misled the jury if submitted. *See State v. Jaco*, 156 S.W.3d 775, 782 (Mo. banc 2005); *see also State v. Derenzy*, 89 S.W.3d 472, 475 (Mo. banc 2002).[7]

---

[7] In *Derenzy*, 89 S.W.3d at 475, this Court held that, although a trial court's rejection of an incorrectly worded lesser included offense instruction proffered by the defendant was "not error," the trial court's failure to correct and submit a properly worded instruction was nonetheless plain error resulting in "manifest injustice." As reasoning for its decision, *Derenzy* cited Rule 28.02(a), which requires a trial court to "instruct the jury in writing upon all questions of law arising in the case that are necessary for their information in giving the verdict." Rule 28.02(a) applies to those instructions that are mandatory even if not requested by the defendant. The lesser included instruction at issue in *Derenzy*, however, was not an instruction that was necessary for the jury's

11

Mr. Blurton argues, however, that his failure to proffer a separate jury instruction for the underlying felony of robbery in the second degree is inconsequential because he included "all the elements that would have been in the cross-referenced instruction" in the first paragraph of his proffered second degree felony murder instruction. This assertion is incorrect. As stated above, the trial court does not err in refusing a flawed instruction and, accordingly, this Court need not consider whether the proffered instruction would have prejudicially confused or misled the jury if submitted. *Jaco*, 156 S.W.3d at 782. But, even if this Court were to consider the prejudicial effect of the proffered instruction, Mr. Blurton's proffered instruction would have confused or misled the jury because it did not properly enumerate the elements of robbery in the second degree and did not describe the property alleged to have been taken.

The verdict director for robbery in the second degree requires each element of the felony to be listed in separate enumerated paragraphs. MAI-CR 3d 323.04. Instead of following these requirements, Mr. Blurton included all the elements of robbery in the

information, i.e., a mandatory instruction. A non-mandatory lesser included instruction is governed by Rule 28.02(b), which requires *counsel* to "submit to the court instructions and verdict forms that the party *requests* be given." (Emphasis added). The rationale applied by the Court in *Derenzy* to find that the trial court plainly erred in not correcting and submitting a properly worded instruction should apply only when an instruction is mandatory, even when not requested. In this case, as in *Derenzy*, the lesser included instruction is an instruction that must be requested rather than an instruction the trial court is mandated to give. *See Jackson*, 433 S.W.3d at 396. Therefore, the provision in Rule 28.02(a) cited by this Court in *Derenzy* does not support its conclusion that the trial court plainly erred in not correcting the defendant's improperly worded lesser included jury instruction and is at odds with this Court's usual rule that the trial court does not commit reversible error by refusing to give an incorrect instruction. *Parkhurst*, 845 S.W.2d at 37; *see also Immekus*, 28 S.W.3d at 432-33; *Binnington*, 978 S.W.2d at 776; *Powers*, 913 S.W.2d at 142; *Colson*, 926 S.W.2d at 883. The trial court, here, was not obligated to correct and submit a properly worded lesser included felony murder instruction.

second degree in the first paragraph of the second degree felony murder instruction without enumerating each element. In doing so, Mr. Blurton's proffered instruction blurs the distinction between the elements and, therefore, could have confused or misled the jury's understanding of what it was required to find beyond a reasonable doubt. Moreover, MAI-CR 3d 323.04 requires a description of the property that the defendant allegedly took. *See also State v. Johnson*, 457 S.W.2d 762, 765 (Mo. 1970). Mr. Blurton, however, offered no description of the property alleged to have been taken, but instead, merely stated that the defendant "took property." Because evidence was presented at trial of various items missing from the Luetjens' home, including $200 from Mr. Luetjens' wallet, his change collection from his dresser drawer, his arrowhead collection, and three guns, this failure to specify the alleged property would not have required the jury to unanimously find what property Mr. Blurton had taken.

Accordingly, because Mr. Blurton's tendered instruction was not in proper form, the trial court did not err in rejecting Mr. Blurton's incorrect second degree felony murder instruction.

### No Reversible Error in Admitting or Excluding Evidence

Mr. Blurton further asserts that the trial court abused its discretion in admitting evidence over his objection and excluding evidence he wished to present at trial. Specifically, Mr. Blurton contends that the trial court erred in admitting evidence and testimony from a lay witness regarding the location of the cell phone towers to which Mr. Blurton's cell phone connected on the night of the murders and testimony from the state's fingerprint analyst who described the Missouri state highway patrol crime

13

laboratory's peer review protocol of latent fingerprint analysis as requiring other "qualified" examiners to "verify" her identifications. He further contends that the trial court erred by excluding: (1) evidence that someone else had motive or opportunity to commit the crime; (2) testimony from the Luetjens' daughter that she was concerned for her safety due to rumors and telephone calls made from Taron's mother and maternal grandmother; and (3) testimony from the Luetjens' friend about the telephone calls from Taron's mother and maternal grandmother.

A trial court has broad discretion to admit or exclude evidence at trial. *State v. Hunt*, 451 S.W.3d 251, 263 (Mo. banc 2014). A trial court's decision regarding the exclusion or admissibility of evidence is reviewed for an abuse of discretion. *Id.* A trial court abuses its discretion only if its decision to admit or exclude evidence is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014) (internal quotations omitted). Claims of trial court error are reviewed "for prejudice, not mere error." *State v. Clark*, 364 S.W.3d 540, 544 (Mo. banc 2012) (internal quotations omitted). This Court will reverse the trial court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial. *Id.*

### A. Cell Phone Tower Evidence

Mr. Blurton first asserts that the trial court abused its discretion in admitting, over his objection, evidence of the location of the cell phone towers to which his cell phone

14

connected on the night of the murders, June 7, 2009, showing that Mr. Blurton was traveling from his home in Garnett, Kansas, to Cole Camp. Mr. Blurton asserts that this evidence required an expert witness because it was not within the knowledge or expertise of a lay person.

Expert opinion testimony is required if the witness is testifying "to matters requiring special skill or knowledge and is not within the knowledge or understanding of mankind generally[.]" *State v. Eaton*, 504 S.W.2d 12, 21 (Mo. 1973). Expert opinion "must be based upon a valid and accepted scientific methodology and assist the trier of fact in the determination of an issue." *Smulls v. State*, 71 S.W.3d 138, 150 (Mo. banc 2002). An expert is qualified to provide an expert opinion if "he has knowledge from education or experience which will aid the trier of fact." *State v. Mallett*, 732 S.W.2d 527, 537 (Mo. banc 1987). "The qualifications of a witness to render an expert opinion lie within the trial court's discretion." *State v. Rutter*, 93 S.W.3d 714, 729 (Mo. banc 2002). The trial court abuses its discretion in admitting such evidence only "when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.*

To qualify as an expert in the field of telephone toll analysis, the witness needed to have specialized training and experience that would aid the trier of fact. As a criminal intelligence analyst for the Missouri highway patrol, the witness routinely performed telephone toll analysis on cell phone calls, including those Mr. Blurton made and received on the night of June 7, 2009. The witness testified that he began working in

15

cellular telephone analysis in 2004 when he worked at the drug enforcement administration as an intelligence analyst. During this time, he went to call analyst training school, where he was instructed how to analyze telephone records. After working as an intelligence analyst for three years at the drug enforcement administration, he was promoted to an operations sergeant supervising 12 other intelligence analysts. In 2009, he began working as a criminal intelligence analyst at the Missouri highway patrol.

To perform telephone toll analysis on Mr. Blurton's calls, the witness first obtained an Excel spreadsheet of Mr. Blurton's cell phone records from the telephone company. After obtaining the records from the telephone company, he then sorted these records to show only those calls made to and from Mr. Blurton's cell phone around the time of the murders. The record of each call also provided the exact geographic location of the cell tower to which Mr. Blurton's cell phone was connected at the beginning and the end of the call. Using this information, the witness then mapped the location of each of these cell towers using a consumer mapping program. In doing so, he created a map that showed the times of the calls and their respective cell phone towers.

At trial, Mr. Blurton objected that the witness could not testify "about [the] analysis of [Mr. Blurton's cell phone] records" because "he's not a properly qualified expert" and had "no expertise besides attending this one [training] program." The trial court overruled this objection. Mr. Blurton also objected that the witness was not properly qualified as an expert in cell phone tower plotting. In overruling this objection the trial court stated that, although the state may not have been offering the witness as an expert, the state showed that his "qualification[s] were that he did telephone analysis and

16

telephone toll analysis," that the state "then described what that was." The trial court concluded, therefore, that the witness was "just testifying, like any other clerk . . . if they were given an assigned task, and were told how to do the task[.]"

Although there may have been sufficient evidence in the record before the trial court to support a finding that the witness was an expert qualified in the field of telephone toll analysis, it was not necessary for the trial court to make such a finding. Missouri courts have held that "[r]eading the coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique" because cell phone records are factual records and no special skill is required to plot these records. *State v. Patton*, 419 S.W.3d 125, 130 (Mo. App. 2013); *State v. Ford*, 454 S.W.3d 407, 413-14 (Mo. App. 2015). Such evidence can be introduced by a lay witness as long as the lay witness confines the testimony to the facts contained in the cell phone records. *Patton*, 419 S.W.3d at 130. Accordingly, the trial court did not err in admitting the witness's testimony about his telephone toll analysis of Mr. Blurton's calls.

Mr. Blurton, nevertheless, asserts that an expert was required in this case because the state introduced evidence regarding the location of Mr. Blurton's cell phone relative to the tower to which it connected. The witness admitted that he was not an expert in determining which cell phone tower a cell phone would connect to in a particular location based on weather or terrain and therefore, that, Mr. Blurton's cell phone could have been located anywhere around "whatever radius the [cell phone] tower was covering[.]"

In this argument, Mr. Blurton relies on prior cases holding that an expert witness is required if the witness attempts to identify the specific location of a defendant in relation

17

to the cell phone tower to which the defendant's cell phone connected. *Patton*, 419 S.W.3d at 130-31. An expert is required because such an identification requires broad inferences due to a cell phone's ability to connect to a cell tower "as far away as thirty miles or as close as thirty feet" depending on myriad factors such as geography, weather, or the cell phone itself. *Id.* at 131. Accordingly, to identify the specific location of the defendant based on cell phone tower connections, an expert witness must make "an expansive range of inferences" that requires "the aid of specialized experience or knowledge in the field of cellular communications[.]" *Id.* at 132.

For example, in *Patton*, a lay witness testified that at the time of the crime the defendant's cell phone was connected to a cell tower near the crime scene. *Id.* at 129. The defendant alleged that he was at his cousin's house four miles from the crime scene. *Id.* at 129, 132. The lay witness drew the inference that the cell phone records proved the defendant was near the crime scene and not at his cousin's house because the defendant's cell phone was connected to the tower closest to the crime scene and not a cell tower near his cousin's house. *Id.* at 132. The court of appeals held that the trial court erred in not requiring an expert to present this evidence when the identification of the defendant near the crime scene and not at his cousin's house required technical inferences outside a lay witness's common knowledge. *Id.* Likewise, in *Ford*, a lay witness improperly testified that the defendant was "near the murder scene" because the defendant's cell phone connected to a nearby tower. 454 S.W.3d at 410-11. Once again, an expert was required. *Id.* at 414-15.

In this case, however, the state did not attempt to show the exact location of Mr. Blurton's cell phone in relation to the cell tower to which his cell phone was connected at the time the calls were made, and the witness did not testify that the cell tower analysis could show that Mr. Blurton was at or near the Luetjens' house. Rather, the testimony was that "based off the phone associated with Mr. Blurton, the time the calls were made, the cell tower locations, it shows a mode of travel highway 7, up highway 75 – to Cole Camp." Likewise, during closing argument, the state referenced the map the witness had created to argue the reasonable inference that Mr. Blurton had traveled from Garnett, Kansas, to Cole Camp and that his last two cell phone calls "hit off of" cell phone towers located in Cole Camp.

As discussed above, the witness's utilization of Mr. Blurton's cell phone records to plot the progression of the cell phone towers to which Mr. Blurton's cell phone connected did not require the special skill or knowledge of an expert. His telephone toll analysis showed both a progression of time between Mr. Blurton's calls from 8:16 p.m. to 9:59 p.m. on the night of the murders and a corresponding progression of distance as his calls connected to various cell phone towers located along the general route from Garnett to Cole Camp. Unlike in *Patton* and *Ford*, in which lay witnesses improperly attempted to pinpoint the defendants' exact location within a small geographic area, Cole Camp is more than 125 miles away from Garnett, Kansas. Even if Mr. Blurton's cell phone connected to a cell tower 30 miles away from his actual location at the time of each call, the witness could still reasonably infer Mr. Blurton's general path of travel from Garnett

19

to Cole Camp without using specialized skill or knowledge. Accordingly, the trial court did not abuse its discretion in admitting this evidence and testimony.

## B. Fingerprint Evidence

Mr. Blurton next contends that the trial court abused its discretion in overruling his objection to the testimony of the state's latent fingerprint analyst. Mr. Blurton objected to the witness's testimony that the results of her fingerprint analysis had been "verified" by another "qualified" examiner, which made her confident in her conclusions because "there weren't issues." Mr. Blurton asserts that this testimony was inadmissible hearsay, a violation of the confrontation clause, and improper bolstering.

Specifically, Mr. Blurton asserts that the trial court erred four times in admitting this testimony. Mr. Blurton's objections to the witness's testimony that her results had been "verified" followed his objection that the state had not laid a proper foundation for her identification of the fingerprints found at the crime scene. The questions to the witness, her answers, and Mr. Blurton's objections are as follows:

First objection:

Q: And in addition to that, in your lab, do you have a peer review protocol when you make an identification in a case?

A: Yes.

Q: And what is a peer review, what is your peer review protocol?

A: Anytime we have an identification, at least at the time this was, all identifications had to be verified by another examiner going through the same process I did when I compared it and identified it.

Q: And was that, in fact, done in this case?

A: Yes, it was.

20

Q:      How many other peer reviewers, if you know.

A:      I had my official, or primary verifier, and I, I believe there were two
        other individuals, actually.

Following this exchange Mr. Blurton objected on the grounds of *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), which bars the admission of out-of-court testimonial statements of witnesses who do not appear unless they are unavailable to testify. Citing *Crawford*, Mr. Blurton objected to the witness "relating what other analysts have to say about, about this evidence." The trial court ruled:

> Okay, she should, she should not testify as to what somebody else may have said anything like that, but as part of the foundation, the process was that helps her reach her conclusions, I think you're going to ask her, that will be allowed.

> So, the objection to hearsay is sustained. She hadn't gotten there, but I knew you were anticipating that. Let's go.

Following the court's ruling, the state again attempted to question the witness about the peer review protocol.

Second objection:

Q:              And, ma'am, the peer review process that you went
                through, did that help you, I don't know, feel confident
                in your conclusions that you reached in this case.

A:              Sure.

Q:              And don't, I mean, don't tell me what these folks
                concluded, but there weren't issues, were there?

A:              No, there were not.

Defense counsel:    Objection, your honor, that question's, same matter,
                    objection as at the bench, it's asked the same way, or
                    in a different manner.

21

Court:              Overruled.

Defense counsel:    Judge –

Court:              Overruled.

Mr. Blurton next objected to the witness's attempt to identify the second fingerprint found on the white coffee mug at the crime scene.

Third objection:

Q:                  And did you send this through that same peer review process that you described at the crime lab?

A:                  Yes.

Defense counsel:    Well, objection, your Honor, that's a violation of Crawford versus Washington.

State:              Judge, I –

Court:              Sustained as to the form of the question.

Immediately following this exchange, the state rephrased its question.

Fourth objection:

Q:                  What is, again, the protocol of the crime lab when you've made an identification of a fingerprint?

A:                  It is, it is, excuse me, it's verified by another qualified examiner.

Q:                  And was –

Defense counsel:    Well, objection, may we approach?

Court:              Sure.

Defense counsel:    This [] not only violates Crawford versus Washington, but it's also bolstering.

State:              Well, Judge –

22

Court:      Well, overruled as to bolstering. The objection is that there wasn't a foundation for this particular exhibit. The language chosen by the witness, the use of the word verified, was, in one respect, responsive to the question as to what was the protocol.

*** 

Defense counsel:      – I'm sorry, your Honor, but what it boils down to is that she's essentially telling this jury that somebody else looked at it and said, yes, you're right, and that's, that is the message that's being sent to the jury.

Court:      Okay. Would you like for me to instruct the jury to disregard her last answer, and I was only, I'm not overly concerned about it, but the use of the word, verified, by another, I'll do that, if you're asking for that.

Defense counsel:      Yes, I would request it.

*** 

Defense counsel:      Are we waiting until after lunch to instruct the jury to disregard what they heard?

Court:      I'll do it, thank you, I'll do it right now.

Defense counsel:      Thank you.

Court:      The last answer of the witness, which was with respect to a protocol followed in the lab regarding forming opinions, the witness offered some information with respect to what some other person may have done or said, and the jury is instructed to disregard that portion of the answer, not to consider it when you retire to deliberate on the case.

This record makes clear that the trial court sustained Mr. Blurton's first, third and fourth objections to the testimony. He did not ask for any further relief. After the fourth objection, the trial court suggested that it could instruct the jury to disregard the answer. Mr. Blurton asked that the trial court do so, and it did. A defendant who has "received

23

the relief he requested . . . has no claim of reversible error." *State v. McFadden*, 391 S.W.3d 408, 423 (Mo. banc 2013). In none of these instances did Mr. Blurton request that the trial court grant him any additional relief. Accordingly, in response to Mr. Blurton's first, third, and fourth objections, the trial court granted Mr. Blurton the relief he requested at trial, so there was no trial court error.

With regard to his second objection, Mr. Blurton's objection was untimely and did not preserve anything for appellate review. Mr. Blurton's second objection came only after the witness had answered two questions. A trial court's ruling on an objection is preserved for appellate review only if the objection was timely or the party timely moved to strike the answer. *State v. McFadden*, 369 S.W.3d 727, 740 (Mo. banc 2012); *see also State v. Sykes*, 372 S.W.2d 24, 27 (Mo. 1963). An objection to testimony must be made at the earliest possible opportunity to allow the trial court to invoke remedial remedies. *State v. Borden*, 605 S.W.2d 88, 90 (Mo. banc 1980).

Although the trial court overruled Mr. Blurton's second objection, Mr. Blurton objected only after the witness had completely answered the question: "[D]id [the peer review protocol] help you, I don't know, feel confident in your conclusions that you reached in this case?" An objection made after a witness gives a responsive answer to an objectionable question is usually not timely. *Sykes*, 372 S.W.2d at 27. The exception is if the witness answers so quickly that it is impossible to object or if the grounds for the objection become apparent only when the answer is given. *State v. Smith*, 90 S.W.3d 132, 139 (Mo. App. 2002); *State v. Evenson*, 35 S.W.3d 486, 491-92 (Mo. App. 2000);

24

*see also State v. Williams*, 416 S.W.2d 71, 73 (Mo. 1967). In these circumstances, the opposing attorney must object to the answer as soon as possible. *Id.*

In this case, the grounds for Mr. Blurton's objection to the witness's second answer were apparent as soon as the state asked the second question. The question was not open-ended and was little more than a rephrasing of the question immediately preceding it, which the witness had responsively answered. Additionally, admission of testimony over objection is not reversible error if similar questions have previously been asked and answered without objection. *State v. Taylor*, 408 S.W.2d 8, 11 (Mo. 1966); *see also State v. Goins*, 306 S.W.3d 639, 647 (Mo. App. 2010). Just prior to her answer: "No, there were not [issues]," she had answered "sure" to the state's question: "[T]he peer review process that you went through, did that help you . . . feel confident in your conclusions that you reached in this case." Mr. Blurton did not object at all to this first answer. Because the witness had already stated that the review process made her feel confident in her conclusions, her response to the second question and the grounds for the objection were apparent as soon as the state asked the second question. Accordingly, Mr. Blurton's second objection was not timely and preserved nothing for appellate review.

The trial court sustained Mr. Blurton's first, third and fourth objections and granted him all the relief he requested. Accordingly, the trial court did not err. In the only instance in which the trial court overruled his objection, the trial court did not err because the alleged error was unpreserved due to the untimeliness of the objection and because similar testimony had already been admitted without objection.

25

## C. Evidence that Someone Else Had a Motive or Opportunity to Commit the Crime

Mr. Blurton next asserts that the trial court abused its discretion in partially granting the state's motion in limine to prohibit Mr. Blurton from arguing or presenting evidence that Taron's estranged mother could be responsible for the victims' deaths due to her motive and opportunity to commit the crimes. A pretrial hearing on the motion in limine focused on whether the defense could call the Luetjens' neighbor to testify that she saw Taron's mother outside of the Luetjens' house at 8 p.m. on the night of the murders. The defense stated that the neighbor would testify that she saw Taron's mother "exit the victims' home, light a cigarette, talk on a cell phone while pacing back-and-forth for 10-15 minutes, extinguish her cigarette on the bottom of her shoe, put the cigarette butt in her jeans' pocket, flip her phone shut, and go back inside the victims' home[.]" Mr. Blurton contends that these actions outside the Luetjens' house were acts that directly connected Taron's mother to the murders and that he should have been allowed to argue that she may have been involved in the murders.

In partially sustaining the state's motion in limine to exclude evidence regarding Taron's mother's motive and opportunity to commit the crime, the trial court ruled that Mr. Blurton could present evidence to the jury that Taron's mother was "at or near the scene of the homicide." Additionally, the trial court stated that Mr. Blurton could make an offer of proof for any evidence that would directly connect Taron's mother "with an overt act in the commission of the homicides, rather than her mere presence at the scene sometime prior to the commission of the homicides." If the trial court ruled favorably on this offer of proof, Mr. Blurton could present this evidence to the jury alongside argument

26

that Taron's mother committed the murders. The trial court noted, "This is a motion in limine. It's an interlocutory order, and can be reviewed[.]"

As correctly stated by the trial court, a ruling on a motion in limine is interlocutory and subject to modification at trial. *See State v. Cole*, 71 S.W.3d 163, 175 (Mo. banc 2002). Accordingly, a "motion in limine, in and of itself, preserves nothing for appeal." *Id.* To preserve this claim of error for appellate review, Mr. Blurton was required to attempt to present this evidence at trial. *See id.* Despite the trial court's ruling that Mr. Blurton could present testimony regarding Taron's mother's presence at the Luetjens' house, Mr. Blurton did not attempt to present any of this evidence at trial by calling either the neighbor or Taron's mother to testify or make an offer of proof as to their testimony. Specifically, Mr. Blurton did not attempt to present the neighbor's testimony that she saw Taron's mother exit the Luetjens' home at around 8:00 p.m., light a cigarette, talk on her cell phone, place the extinguished cigarette in her pocket, then went inside 10 to 15 minutes later.

Instead, in an attempt to directly connect Taron's mother to the murders, Mr. Blurton made offers of proof of the testimony of the Luetjens' daughter, the Luetjens' friend, and a police sergeant. Each offer of proof was made during a recess soon after each had testified. Each took the stand, and Mr. Blurton and the state each had an opportunity to question them. The daughter and the friend both testified that Taron's mother and maternal grandmother made telephone calls to them after the murders. One of the calls from Taron's maternal grandmother to the friend was threatening insofar as Taron's maternal grandmother stated that if the friend did not tell her what had happened

27

to Taron "you'll end up dead just like her." The sergeant testified that he had accused Taron's mother of being involved in the murders during a police interview. She denied these accusations. The sergeant testified that he did not really believe Taron's mother was involved in the crime, that throughout the interview Taron's mother had remained reasonable, had not in any way indicated she was involved, and had agreed to and did take a polygraph test. As is discussed later, Mr. Blurton appeals the trial court's denial of his offer of proof of the friend's testimony. Mr. Blurton does not appeal the trial court's denial of his offer of proof of the sergeant's testimony. Because Mr. Blurton did not attempt to present testimony from the neighbor or Taron's mother at trial or make an offer of proof of their testimony, he did not preserve for appeal his claim that the trial court erred in excluding evidence that Taron's mother had motive and opportunity to commit the crimes.

### D. Bias of Victims' Daughter

Mr. Blurton next contends that the trial court abused its discretion by excluding evidence that the Luetjens' daughter felt concerned for her safety from Taron's mother because of rumors about Taron's mother and a threatening telephone call from Taron's maternal grandmother to the Luetjens' friend. Mr. Blurton argues that the Luetjens' daughter's fear of Taron's mother may have caused the daughter to be reluctant to identify Taron's mother's involvement in the murders. Mr. Blurton further asserts that the daughter's fear of Taron's mother may have caused the daughter to feel pressure to identify Mr. Blurton's voice in the 911 call. Mr. Blurton does not appeal the trial court's denial of his offer of proof of the daughter's testimony on the ground that it would show

28

an overt act from Taron's mother that directly connected her to the murders. Instead, Mr. Blurton appeals the trial court's denial of his offer of proof of the daughter's testimony on the ground the daughter's testimony would have shown her bias and motive to testify untruthfully.

After the daughter testified at trial, Mr. Blurton made an offer of proof of her testimony. In the offer of proof, the daughter testified that she was concerned for her safety because two or three days after the murders she heard rumors that "[Taron's mother] was going to try to come and take Taron's body from [them], so [they] couldn't bury her with [her] family." The daughter also stated that she was present during a telephone call from Taron's maternal grandmother to the Luetjens' friend, and although she did not hear the conversation, the friend told her that Taron's maternal grandmother made a threat "along the lines of something to the effect of the same thing [as had happened to Taron] [was] going to happen to [the friend]."

The state asserts that this issue is not preserved because Mr. Blurton had only argued to the trial court "that he wanted to question [the daughter] as part of his effort to develop evidence regarding [Taron's mother] as an alternative suspect" and not that the daughter's fear of Taron's mother "might have motivated her to distort or exaggerate her testimony." For an allegation of error to be preserved for appellate review, the error must be presented to or decided by the trial court. *State v. Davis*, 348 S.W.3d 768, 770 (Mo. banc 2011). This issue is preserved because, regardless of whether Mr. Blurton expressly offered the daughter's testimony at trial to show her bias, the trial court ruled on this issue, stating that "[t]hose questions and answers would be allowed . . . to show bias of

29

this witness against a witness who, I'm assuming m[a]y testify." After Mr. Blurton stated that he did not intend to call Taron's mother to testify, however, the trial court reversed its decision.

While the daughter's proffered testimony could have been relevant to show her motive to testify untruthfully about Taron's mother, Taron's mother was not an "issue or personality" in the case. A defendant may cross-examine a witness to "reveal[] possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand" in an attempt to impeach the witness's credibility. *Davis v. Alaska*, 415 U.S. 308, 316 (1974); *see also State v. Johnson*, 700 S.W.2d 815, 817 (Mo. banc 1985). Here, the trial court did not err because Mr. Blurton did not call Taron's mother to testify at trial, nor did he call the Luetjens' neighbor who allegedly saw Taron's mother outside of the Luetjens' home on the day of the murders. As such, the daughter's testimony about the rumors and telephone calls would not have revealed any biases against an issue or personality in the case. *See Davis*, 415 U.S. at 316.

In addition to offering the daughter's testimony to show that her fear of Taron's mother may have caused her to be reluctant to identify Taron's mother's involvement in the murders, Mr. Blurton also sought to admit the daughter's testimony as evidence of her motive to falsely testify about hearing Mr. Blurton's voice on the 911 call. To be admissible, evidence must be both logically and legally relevant. *State v. Taylor*, 466 S.W.3d 521, 528 (Mo. banc 2015). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* Evidence is legally relevant when the probative value of the evidence outweighs "unfair prejudice, confusion of the issues,

30

misleading the jury, undue delay, waste of time, or cumulativeness." *State v. Johnson*, 406 S.W.3d 892, 902 (Mo. banc 2013) (internal quotations omitted). A trial court may "limit or exclude the use of impeachment evidence whose prejudicial effect far out-distances its value to the jury as an aid for determining credibility." *Johnson*, 700 S.W.2d at 818.

Mr. Blurton presented no evidence that linked the daughter's fear of Taron's mother to a motive for her to falsely identify Mr. Blurton's voice on the 911 call. The daughter's testimony of her fear, therefore, was, of tenuous logical relevance to show that the daughter had a motive to falsely accuse Mr. Blurton. Accordingly, the trial court did not abuse its discretion in excluding this testimony. The Luetjens' daughter's testimony about Taron's mother would have been of little probative value to assist the jury in determining the daughter's credibility and would likely have confused the issues or misled the jury. *Johnson*, 406 S.W.3d at 902.

### E. Evidence of Threatening Telephone Calls

Mr. Blurton also asserts that the trial court abused its discretion when it excluded testimony from the Luetjens' friend about telephone calls from Taron's mother and maternal grandmother. Mr. Blurton contends that this testimony would have confirmed and corroborated the daughter's testimony that she felt concerned for her safety because of the telephone calls and rumors about Taron's mother and the Luetjens' friend's testimony would have supported the testimony of a neighbor about seeing Taron's mother outside of the Luetjens' home on the day of the murders.

31

The state argues that this issue is not preserved because Mr. Blurton never presented these theories of admissibility to the trial court. For an allegation of error to be preserved for appellate review, the error must be presented to or decided by the trial court. *Davis*, 348 S.W.3d at 770. Regardless of Mr. Blurton's failure to specify why he was offering the friend's testimony, the trial court expressly ruled on whether that testimony was admissible as evidence related to whether Taron's mother may have committed an overt act that directly connected her with the murders or as relevant to the Luetjens' daughter's fear of Taron's mother. In its objection to the daughter's offer of proof, the state objected to the friend's testimony because the state argued that it was being offered to support the argument that Taron's mother had motive or opportunity to commit the murders and because the threat had come from Taron's maternal grandmother and not directly from Taron's mother. The trial court expressly denied the offer of proof for these same reasons. Accordingly, because these theories of admissibility were decided by the trial court, this issue is preserved.

After the friend testified at trial, Mr. Blurton made an offer of proof of her testimony. In the offer of proof, she testified that on the day the Luetjens' bodies were discovered, her sister had a conversation with Taron's mother and the friend had several conversations with Taron's maternal grandmother. The friend testified that Taron's maternal grandmother called her to ask what had happened to Taron, her granddaughter. The friend did not disclose any information. During one of these calls to her, Taron's maternal grandmother stated: "If you do not tell me about my granddaughter, you'll end up dead just like her." The friend also overheard the conversation her sister had with

32

Taron's mother. She overheard her sister tell Taron's mother to call the sheriff's office to find out what happened to Taron and heard her sister refuse to provide Taron's mother with any additional information. The friend's sister told the friend that Taron's mother then hung up the telephone.

As noted previously, to be admissible, evidence must be both logically and legally relevant. *Taylor*, 466 S.W.3d at 528. "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* Evidence is legally relevant when the probative value of the evidence outweighs "unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Johnson*, 406 S.W.3d at 902 (internal quotations omitted).

The proffered testimony was not logically relevant to any material fact at issue in the case at trial. The trial court properly excluded the Luetjens' daughter's testimony that she feared Taron's mother and that the daughter was with the friend and her sister when Taron's mother and maternal grandmother made the telephone calls to them. The trial court ruled that this evidence was not relevant. Because the daughter's proffered testimony was properly excluded, the neighbor's testimony was not relevant without the daughter's testimony. Additionally, because Mr. Blurton did not attempt to call the neighbor who allegedly saw Taron's mother outside the Luetjens' home on the day of the murders as a witness at trial, the friend's testimony was not relevant without the neighbor's testimony. Accordingly, the trial court did not abuse its discretion in denying the friend's offer of proof.

## No Error Rejecting Mistrial Request

In his final claim of error, Mr. Blurton asserts that the trial court abused its discretion in denying his requests for a mistrial after the state inadvertently showed three separate witnesses and the jury graphic crime scene photographs of the victims when the state was calling up photographs on a PowerPoint presentation. Mr. Blurton contends this evidentiary error warranted a mistrial because the unexpected viewing of the gruesome photographs "triggered excess emotions against [Mr. Blurton]" and "caused [Mr. Blurton's] sentence to be imposed under the influence of passion."

Although the trial court had the discretion to grant Mr. Blurton's mistrial requests, a mistrial "is a drastic remedy and should be employed only in the most extraordinary circumstances." *State v. Taylor*, 298 S.W.3d 482, 512 (Mo. banc 2009) (internal quotations omitted). "This decision is left to the discretion of the trial court, as it is in the best position to determine whether the incident had a prejudicial effect on the jury." *State v. Ward*, 242 S.W.3d 698, 704 (Mo. banc 2008). A trial court abuses its discretion to grant a mistrial only if "its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration." *Id.* A mistrial should only be used "in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *Id.* A trial court may also grant a mistrial if the evidentiary error is intentionally injected into the trial. *State v. Aguilar*, 478 S.W.2d 351, 355 (Mo. 1972).

During the state's direct examination of the Luetjens' daughter, the state first inadvertently showed her a photograph of the bound hands of one of the victims instead of a photograph of a vehicle owned by the Luetjens. An investigator in the public defender's office testified at a hearing on Mr. Blurton's motion for a new trial that several jurors reacted to the photographs by jolting or leaning forward in their chairs, covering their mouths, or widening their eyes. One juror also said an expletive. Mr. Blurton almost immediately asked the trial court to approach the bench. During the sidebar, the state explained that all of its photographs were organized into a PowerPoint presentation on a laptop computer, which was then displayed on a large television screen in the courtroom. To access a photograph, the state would type in the photograph's exhibit number and then press enter. The state had inadvertently displayed the incorrect photograph when it either typed in the incorrect exhibit number or had typed in a number, did not press enter, then typed in another number. After seeing the photograph, the daughter began to cry while on the stand in view of the jury. Mr. Blurton requested a mistrial, which the trial court denied. Mr. Blurton also asked the trial court to grant a recess to allow the daughter to compose herself, which the trial court also denied after asking the daughter if she wanted to take a break and she declined.

The state then inadvertently showed the daughter's ex-husband a series of crime scene photographs in rapid fashion when it attempted to display a photograph of the Luetjens' house. The investigator testified that the jury reacted less than it had when the first photograph was inadvertently displayed but that a few of the jurors leaned forward, covered their mouth with their hands, or lowered their heads. This time the state

35

explained that it started with the first photograph on the PowerPoint presentation and rapidly flipped through 12 photographs until it reached the correct photograph. Mr. Blurton again requested a mistrial arguing it was "highly inflammatory for [the photographs] to be shown to the jury in that type of fashion." The trial court denied Mr. Blurton's request.

Lastly, the state inadvertently showed a photograph of Donnie's body to Donnie's acquaintance for three or four seconds. The investigator testified that, although there may have been some reaction by the jurors, the reactions were not clearly evident this time. Mr. Blurton moved for a mistrial, asserting that the photographs had a "negative effect on [the] jury." The trial court denied the request for a mistrial. After this denial, Mr. Blurton requested the trial court to instruct the jury to disregard the photographs. When the trial court agreed to do so, Mr. Blurton withdrew the request before the trial court could act because he was afraid that "if the court says anything, it's just going to highlight it here even more than it's happened." The trial court then asked the state if it could show the photographs in paper or poster form instead of using the PowerPoint, and the state agreed to do so. Before allowing the state to resume its direct examination, the trial court warned that it "really [didn't] want it to happen again either."

The state's inadvertent publication of the crime scene photographs did not require the extreme remedy of a mistrial. Mr. Blurton presents no evidence that the state intentionally showed the Luetjens' daughter or the other witnesses the photographs. Additionally, all of the photographs inadvertently shown either had been or were later admitted into evidence and shown to the jury. Although the photographs were gruesome

36

and may have triggered emotions from the jury, the photographs were gruesome "because the crime itself was gruesome." *State v. Johnson*, 244 S.W.3d 144, 161 (Mo. banc 2008). "Gruesome crimes produce gruesome, yet probative, photographs, and a defendant may not escape the brutality of his own actions." *State v. Strong*, 142 S.W.3d 702, 721 (Mo. banc 2004) (internal quotations omitted). Moreover, Mr. Blurton declined the trial court's offer to instruct the jury to disregard the photographs in an attempt to remove any prejudicial effect through means other than a mistrial. Accordingly, the trial court did not abuse its discretion in denying Mr. Blurton's mistrial requests because the ruling was not against the logic of the circumstances and showed careful consideration and an attempt by the trial court to remove any potential prejudice.

**Death Sentence is Not Excessive or Disproportional**

Although not requested by Mr. Blurton, this Court is required by section 565.035 to independently review Mr. Blurton's death sentence. In its review, this Court determines:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstances found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Section 565.035.3.

First, nothing in the record suggests that the jury recommended the death penalty under the influence of passion, prejudice, or any arbitrary factor. Second, the jury found

37

the following statutory aggravators: (1) Mr. Blurton had a prior serious assaultive conviction; (2) each murder was committed while he was engaged in the commission of two other murders; and (3) the murders involved depravity of mind and, as a result, the murders were outrageously and wantonly vile, horrible, and inhuman insofar as each victim was bound or otherwise rendered helpless and, therefore, Mr. Blurton exhibited a callous disregard for the sanctity of all human life. Each of these statutory aggravators was supported in the record.

Lastly, Mr. Blurton's sentence is proportional to the penalty imposed in similar cases, considering the crime, the strength of the evidence and the defendant. In a factually similar case, the death penalty was imposed when the defendant murdered an elderly victim who had her hands bound, had been shot in the head, and was robbed. *State v. Ramsey*, 864 S.W.2d 320, 325-27 (Mo. banc 1993). The death penalty has been imposed when the defendant has rendered his victim helpless before murdering the victim. *McFadden*, 369 S.W.3d at 754-55; *State v. Anderson,* 306 S.W.3d 529, 544 (Mo. banc 2010); *State v. Tisius,* 92 S.W.3d 751, 766 (Mo. banc 2002). This Court has affirmed sentences of death in cases when the defendant had one prior serious assaultive conviction. *State v. Hosier*, 454 S.W.3d 883, 891, 900 (Mo. banc 2015); *State v. Sidebottom*, 753 S.W.2d 915, 926 (Mo. banc 1988); *State v. Kinder*, 942 S.W.2d 313, 331-32 (Mo. banc 1996). The death penalty has been imposed when the defendant has murdered more than one person. *State v. Driskill*, 459 S.W.3d 412, 432-33 (Mo. banc 2015); *Hosier*, 454 S.W.3d at 899-900; *State v. Wolfe,* 13 S.W.3d 248, 265 (Mo. banc 2000), *abrogated on other grounds by Mitchell v. Kardesch*, 313 S.W.3d 667, 670

(Mo. banc 2010); *State v. Johnson,* 968 S.W.2d 123, 135 (Mo. banc 1998); *State v. Mease,* 842 S.W.2d 98, 102 (Mo. banc 1992). The death penalty has been imposed when the defendant murdered at least one victim and perpetrated a robbery or burglary. *Driskill*, 459 S.W.3d at 432; *State v. Deck,* 303 S.W.3d 527, 532-33 (Mo. banc 2010); *State v. Gilbert,* 103 S.W.3d 743, 745-46 (Mo. banc 2003); *State v. Williams,* 97 S.W.3d 462, 466-67, 475 (Mo. banc 2003).

After considering all the statutory factors, the imposition of the death penalty for Mr. Blurton's murder convictions was not excessive or disproportionate to the penalty imposed in similar cases.

### Conclusion

Mr. Blurton's requested jury instruction on the statutory lesser included offense of felony murder did not properly conform to the requirements in Notes on Use 2(b) of MAI-CR 3d 314.06, and the trial court was not obligated to submit an incorrect instruction. The trial court did not err in refusing to submit an improper instruction to the jury.

The trial court also did not err in admitting evidence at trial over Mr. Blurton's objection. The trial court properly admitted testimony regarding the location of the cell phone towers to which Mr. Blurton's cell phone connected on the night of the murders, including his testimony that this analysis showed Mr. Blurton's cell phone traveling on a path from his home in Garnett, Kansas, to Cole Camp. The witness's testimony of his telephone toll analysis of Mr. Blurton's cell phone calls did not require expert testimony because his testimony was within the realm of a layperson. Moreover, his statement that

39

this analysis showed Mr. Blurton's general path of travel was based only on common inferences within the realm of the ordinary experiences of a layperson. The trial court also did not err in admitting testimony from the state's fingerprint analyst that her conclusions had been verified by other analysts. The trial court sustained three of Mr. Blurton's objections and granted him all the relief he sought, and, in the only instance in which his objection was overruled, the trial court did not err because Mr. Blurton's objection was untimely and similar testimony had already been admitted without objection.

The trial court also did not err in excluding evidence at trial. Mr. Blurton's claim that the trial court erred in excluding evidence of Taron's mother's presence outside the Luetjens' home on the day of the murders was not preserved because Mr. Blurton did not attempt to present this evidence at trial. The trial court did not abuse its discretion in excluding the Luetjens' daughter's testimony about being fearful of Taron's mother due to rumors and a threatening telephone call to the Luetjens' friend because this testimony was not logically relevant to show the daughter's bias against or motive to testify untruthfully about Taron's mother when Taron's mother was not a "personality" in the case or even called as a witness at trial and was of little probative value to show the daughter's motive to falsely identify Mr. Blurton on the 911 call. The trial court did not abuse its discretion in excluding testimony from the Luetjens' friend about telephone calls from Taron's mother and maternal grandmother because this testimony would have only been admissible to support testimony that the trial court properly excluded or that Mr. Blurton did not offer at trial.

The trial court also did not err in rejecting Mr. Blurton's mistrial requests after the state inadvertently showed gruesome photographs from the crime scene during the testimony of three witnesses. No evidence was presented that the state intentionally showed these photographs to the Luetjens' friends or family. Moreover, all of these photographs were later shown to the jury, they were gruesome because the crime was gruesome, and Mr. Blurton declined the trial court's offer to instruct the jury to disregard the photographs.

An independent review by this Court finds that the record does not show that the death sentences were imposed under the influence of passion, prejudice or any arbitrary factor. Additionally, the evidence supports the jury's finding that Mr. Blurton had a prior serious assaultive conviction, that each murder was committed while he was engaged in the commission of two other murders, and that the murders involved a depravity of mind and, as a result, the murders were outrageously and wantonly vile, horrible, and inhuman. Moreover, this Court finds that Mr. Blurton's sentence was not excessive or disproportionate to the penalty imposed in similar cases.

Accordingly, the judgment is affirmed.

_____
PATRICIA BRECKENRIDGE, CHIEF JUSTICE


Russell, J., concurs; Fischer, J., concurs in
separate opinion filed; Wilson, J., concurs
in opinion of Fischer, J.; Draper, J., concurs
in result in separate opinion filed; Stith and
Teitelman, JJ., concur in opinion of Draper, J.

41



# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,               )

               )

          Respondent,    )

               )

v.                    )      No. SC93648

               )

ROBERT BLAKE BLURTON,    )

               )

          Appellant.     )

## CONCURRING OPINION

Robert Blurton appeals three first-degree murder convictions and death sentences. I concur in the principal opinion in all respects, including the principal opinion's explanation that *State v. Jackson* specifically dealt with "nested" lesser-included offenses,[1] 433 S.W.3d 390, 392 (Mo. banc 2014), and the holding that the circuit court

---

[1] It is clear *Jackson* dealt only with "nested" lesser-included offenses:

> The question presented in this case is whether the trial court can refuse to give a lesser included offense instruction requested by the defendant under section 556.046 when the lesser offense consists of a subset of the elements of the charged offense and the differential element (i.e., the element required for the charged offense but not for the lesser offense) is one on which the state bears the burden of proof. The answer, unequivocally, is no.

433 S.W.3d at 392.

****

> [T]he jury's right to disbelieve all or any part of the evidence, and its right to refuse to draw any needed inference, is a sufficient basis in the evidence to justify giving any lesser included offense instruction when the offenses are separated only by one differential element for which the state bears the burden of proof.

was not required to give a lesser-included offense instruction on second-degree felony murder. Because this Court is affirming three death sentences, which will no doubt receive further review by this Court and the federal courts, I write separately to explain that, in my view, the circuit court would not have erred in refusing the second-degree felony murder instruction, even if it were tendered in the form required by the Notes on Use for MAI-CR 314.04 and 314.06. Regardless, Blurton was not prejudiced by the failure to give a second-degree felony murder instruction. *State v. McLaughlin*, 265 S.W.3d 257, 270-71 (Mo. banc 2008); *State v. Hall*, 982 S.W.2d 675, 682 (Mo. banc 1998); *State v. Kinder*, 942 S.W.2d 313, 330 (Mo. banc 1996).

## Factual and Procedural Background

Blurton was charged with three counts of first-degree murder for killing his aunt and uncle and their 15-year-old granddaughter. Police found Donnie, Sharon, and Taron Luetjen dead in their home. Each had been shot once in the back of the head. Each was found lying face down on the floor, head on a pillow, and their hands were bound behind their backs. Donnie's and Sharon's wallets lay empty nearby, and valuable items and change were missing from another room. There was no sign of a forced entry. The State

---

*Id.* at 401.

****

> When dealing with "nested" lesser included offenses . . . "it is ***impossible to commit*** the greater without ***necessarily committing*** the lesser."

*Id.* at 404 (emphasis in original).

2

did not charge robbery or, for that matter, any underlying felony. Blurton presented no evidence during the guilt phase of trial.

The State did, however, file a "Notice of Intent to Seek the Death Penalty." The purpose of this filing is to put the defendant on notice of the potential aggravating factors the State might try to prove during the penalty phase of the trial. The jury was ultimately instructed, during the penalty phase of trial, to consider whether "the defendant was engaged in the perpetration of robbery." Instruction No. 25. According to the verdict, the jury found several aggravating factors existed, listing them in writing on the jury verdict form, but it did not find Blurton was engaged in a robbery or, for that matter, any felony it was asked to consider other than murder.

In addition to an instruction on first-degree murder, the State requested the circuit court to instruct the jury to find Blurton guilty of second-degree murder if he knowingly caused the Luetjens' deaths without premeditation ("conventional" second-degree murder). The State's request to instruct solely on this particular lesser-included offense was in line with this Court's previous express holdings in *McLaughlin*, *Hall*, *Kinder*, and *State v. Griffin*, 756 S.W.2d 475, 485 (Mo. banc 1988). Blurton's proffered jury instruction violated the Notes on Use for MAI-CR 314.04 and 314.06. Had the circuit court given Blurton's proffered, and incorrectly worded, instruction it would have committed error. The circuit court did not, therefore, err in rejecting Blurton's second-degree felony murder instruction. Slip op. at 10. Had Blurton tendered a proper second-degree felony murder instruction, the refusal to give that instruction was in accord with this Court's prior first-degree murder death penalty cases.

Blurton, as the other defendants had done in the above cited cases, requested an instruction for second-degree felony murder.  The circuit court refused to give the proffered instruction.[2]  The State objected on three grounds: (1) that the instruction lacked the proper form and accompanying instructions required under the Notes on Use for MAI-CR 314.04 and 314.06; (2) that this defense may or may not have been supported by the evidence; and (3) that the defense was mutually exclusive of the alibi defense that Blurton had inserted into the case.  The circuit court's decision to refuse the second-degree felony murder instruction is in accord with this Court's first-degree murder

[2] "As to [Counts I, II, and III], if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

As to [Counts I, II, and III], if you find and believe from the evidence beyond a reasonable doubt:

> First, that [on or about] the 7th day of June, 2009, . . . in the County of Benton, State of Missouri, the defendant took property which was property owned by Donnie Luetjen and, that defendant did so for the purpose of withholding it from the owner permanently, and that defendant in doing so used physical force on or against [Donnie, Sharon, and Taron] Luetjen for the purpose of preventing resistance to the taking of the property, then you will find that the defendant has committed robbery in the second degree.  However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you cannot find that the defendant has committed robbery in the second degree.
>
> Second, that [Donnie, Sharon, and Taron] Luetjen [were] shot and killed, and
>
> Third, that [Donnie, Sharon, and Taron] Luetjen [were] killed as a result of the perpetration of that robbery in the second degree,

then you will find the defendant guilty under [Counts I, II, and III] of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree under this instruction, but you must then consider whether he is guilty of murder in the second degree under Instruction No. _____."

4

death penalty cases affirming this approach under similar factual scenarios.[3]  It is also in accord with the jury's verdict in this case indicating there was not sufficient evidence presented that Blurton committed a robbery.

The jury found Blurton guilty on all three counts and recommended three death sentences, which the circuit court imposed.  Blurton appeals directly to this Court, which has jurisdiction.  *See* Mo. Const. art. V, § 3.

## Analysis[4]

Section 556.046 requires circuit courts to give a requested lesser-included offense instruction if there is a basis in the evidence to acquit the defendant of the immediately higher included offense and convict of the lesser.  An offense is included when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged," § 556.046.1(1)—in other words, the elements of the lesser offense are a subset of the elements of the higher offense, or "nested."  *See Jackson*, 433 S.W.3d at 392.  An offense is also deemed included within the offense charged when "[i]t is specifically denominated by statute as a lesser degree of the offense

---

[3] The ruling from the bench was as follows:

> [T]his defendant was not charged with any underlying felony whatsoever.  The tendered instruction picks a felony that the defendant picks, that the State did not charge.  The defense, on this tendered instruction, has picked robbery in the second degree.  By picking an underlying offense, it is inconsistent with alibi, and I think the defense may be, is maybe allowed to argue inconsistent theories, asserting innocence.

> The foreman [sic] [form], which the instruction as tendered, is not the proper -- the facts in evidence in this case do not support that giving of felony murder.  More technically -- murder in the second degree, felony.  It is also inconsistent with the language that the defense did request with respect to the alibi type information.  "A" is refused.

charged." Section 556.046.1(2). This second type of lesser-included offense necessarily requires proof of additional elements, other than the higher offense. §§ 565.025.2(1)(a), 565.021.1(2), RSMo 2000.

As explained in the principal opinion, the circuit court's refusal to give Blurton's second-degree felony murder instruction was not error because it was not in the form required by the Notes on Use for MAI-CR 314.04 and 314.06. Moreover, neither Blurton, the principal opinion, nor the separate opinion of Judge Draper, cite to a single case in which this Court permitted, let alone required, the submission of a second-degree felony murder instruction based on an uncharged felony. Furthermore, the jury in this case did not find that the State proved that Blurton was engaged in a robbery or any other felony.

### Even if Blurton Had Tendered an Instruction on Second-Degree Felony Murder in Accordance with the Notes on Use for MAI-CR 314.04 and 314.06, It Was Not Prejudicial to Refuse to Submit the Instruction

Even assuming the circuit court erred by refusing to instruct on second-degree felony murder in this case, which has not been demonstrated, this Court held in *McLaughlin* that the State had overcome the presumption of prejudice in this same factual scenario. *McLaughlin*, a unanimous decision authored by Judge Stith, is directly on point. In that case, the defendant was charged with first-degree murder, forcible rape, and armed criminal action. 265 S.W.3d at 260-61. The defendant requested an instruction on second-degree felony murder, based on the rape charge, but the circuit

---

[4] Statutory citations are to RSMo Supp. 2013 except where otherwise indicated.

6

court refused to give it and instead instructed on conventional second-degree murder. *Id.* at 261. This Court's opinion states as follows:

> Mr. McLaughlin next argues that the trial court erred in submitting only first-degree and conventional second-degree murder and in refusing to also submit second-degree felony murder. He notes that the state argued that he raped the victim in the same incident in which he murdered her and submitted counts of both forcible rape and first-degree murder. The jury in fact found that Mr. McLaughlin forcibly raped the victim and that he murdered her. Therefore, Mr. McLaughlin argues, the trial court should have submitted felony murder so that he could have argued that if the jury found that he killed the victim in furtherance of the rape, it should convict him of second-degree felony murder rather than first-degree murder.
>
> Mr. McLaughlin is correct that a trial court is obligated to charge the jury with respect to lesser-included offenses that are supported by the evidence, so as to give it a third choice beyond either acquittal or first-degree murder. *Beck v. Alabama*, 447 U.S. 625, 637–38, (1980); *State v. Hall*, 982 S.W.2d 675, 682 (Mo. banc 1998); Sec. 556.046, RSMo 2000. Felony murder is a lesser-included offense of first-degree murder. Sec. 565.025.2(1)(a). Conventional second-degree murder is also a lesser-included offense of first-degree murder, however. For this reason, as Mr. McLaughlin recognizes, *Hall* held that it was not error to refuse to submit felony murder so long as the trial court did submit second-degree murder, for when "a jury convicts on first-degree murder after having been instructed on second-degree murder, there is no prejudice to the defendant by the refusal to submit a second-degree felony murder instruction." *Hall*, 982 S.W.2d at 682, (*quoting State v. Kinder*, 942 S.W.2d 313, 330 (Mo. banc 1996)).
>
> Mr. McLaughlin acknowledges *Hall*, but argues that it is distinguishable because in that case the prosecution did not also submit the felony that underlies the felony murder charge, whereas here the prosecutor did submit both murder and forcible rape. He also argues that he should have had the option, at least, of choosing which form of second-degree murder to submit in this situation.
>
> While the prosecution in *Hall* did not submit the underlying felony, the case on which it relied, *Kinder*, did submit both first and conventional second-degree murder and rape, just as in the case at bar. Thus, it is directly on point. *Kinder* held that because the pattern criminal jury instructions require the jury to find defendant not guilty of first-degree and conventional second-degree murder before considering the felony murder instruction, no

7

prejudice could result from failing to submit felony murder. *Kinder*, 942 S.W.2d at 330.

Of course, Mr. McLaughlin is correct that the trial court could have submitted felony-murder rather than or in addition to submitting conventional second-degree murder without committing error if both were supported by the evidence. But, the issue is not what the trial court could have done, but whether prejudice resulted from its failure to submit felony murder. *Hall*, *Kinder*, and numerous other cases hold that no prejudice results from refusing to submit a felony murder instruction where a conventional second-degree murder instruction was given because the latter sufficiently tests the evidence of deliberation by giving the jury the option of convicting the defendant of a lesser offense. This Court reaffirms these holdings.

*Id.* at 270-71 (some internal citations omitted).

Likewise, in *Hall*, this Court held as follows:

Hall asserts the trial court erred by refusing to submit to the jury an instruction for the offense of second-degree felony murder. "Under section 556.046.2, RSMo 1986, the trial court is obligated to charge the jury with respect to a lesser included offense when there is a basis for a verdict acquitting him of the offense charged and convicting him of the included offense."

We have consistently held that when "a jury convicts on first-degree murder after having been instructed on both first degree and second-degree murder, there is no prejudice to the defendant by the refusal to submit a second degree felony murder instruction." The trial court did not err. Point denied.

982 S.W.2d at 682 (citations omitted).

Likewise in *Kinder,* this Court unanimously held as follows:

Kinder's next claim is that the trial court erred in refusing his second degree felony murder instruction, which was patterned after MAI-CR 3d 313.06. We disagree. The trial court did submit Kinder's conventional second degree murder instruction, which was patterned after MAI-CR 3d 313.04. Under § 556.046.2, RSMO 1986, the trial court is obligated to charge the jury with respect to a lesser included offense when there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense. Murder in the second degree is a

8

lesser-included offense of murder in the first degree. § 565.025.2(1)(a). In reviewing similar claims, this Court has held that "[t]he appropriate MAI-CR 3d requires that the jury find the defendant not guilty of first degree murder and then conventional second degree murder before it may consider second degree felony murder." When a jury convicts on first degree murder after having been instructed on both first degree and second degree murder, there is no prejudice to the defendant by the refusal to submit a second degree felony murder instruction. This is the exact scenario in the current case, and thus Kinder was not prejudiced by the trial court's refusal to submit his second degree felony murder instruction.

942 S.W.2d at 330 (citations omitted).

And likewise in *Griffin,* this Court again expressly held:

Defendant's next point is his assertion that the jury should have been instructed on the lesser included offense of second degree felony murder with respect to each count. Trial courts are obligated to instruct on lesser included offenses supported by the evidence. Section 556.046, RSMo 1986. *See also Beck v. Alabama*, 447 U.S. 625, 635–43 (1980). Although second degree felony murder is not a lesser included offense of first degree murder under the traditional "elements test," it has been specifically denominated as such, *see §§ 556.046 and 565.025, RSMo 1986*.

As the evidence in this case of defendant's state of mind was not conclusive, it did support an instruction on second degree felony murder and the trial court should have so instructed the jury. Defendant, however, was not prejudiced by the court's failure to do this. **The jury *was* instructed on the lesser-included offense of second degree conventional murder. It is a second degree conventional murder instruction, not a second degree felony murder instruction, which sufficiently tests a jury's belief of the crucial facts for a conviction of first degree murder**. . . . The jury had the opportunity to convict defendant of second degree conventional murder but did not do so. An additional instruction on second degree felony murder would have made no difference.

756 S.W.2d at 485 (emphasis added) (some internal citations omitted).

In this case, the jury was given a choice other than capital murder and acquittal:

conventional second-degree murder. It chose to find Blurton guilty of first-degree

9

murder and sentenced him to death based on its determination that the State proved all of the aggravating factors submitted except:

"4. Whether the defendant murdered [Donnie/Sharon/Taron] Luetjen for the purpose of the defendant receiving money or any other thing of monetary value from [Donnie/Sharon] Luetjen or another."

"6. Whether the murder of [Donnie/Sharon/Taron] Luetjen was committed while the defendant was engaged in the perpetration of burglary. A person commits the crime of burglary when the person knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing stealing."

"7. Whether the murder of [Donnie/Sharon/Taron] Luetjen was committed while the defendant was engaged in the perpetration of robbery. A person commits the crime of robbery when he forcibly steals property."

**Conclusion**

Second-degree felony murder is not a "nested lesser" and requires proof of a felony in addition to murder. If the jury chose to disbelieve all or any part of the State's evidence it would result in acquittal of first-degree murder and would not necessarily result in the conviction of second-degree felony murder, which in this case would require proof beyond a reasonable doubt of an uncharged felony. The jury was specifically asked to consider whether the State had demonstrated an underlying felony of robbery in the context of considering aggravating factors for purposes of punishment. The jury did not

10

find a robbery or any felony it was instructed to consider had been committed except three first-degree murders.

In conclusion, I concur in the principal opinion affirming the circuit court's judgment that the instruction on second-degree felony murder was not in the proper form and, therefore, the circuit court did not err in refusing to give it as tendered. For the additional reasons articulated above, it would not have been error to reject a second-degree felony murder instruction even if it was tendered in compliance with the Notes on Use for MAI-CR 314.04 and 314.06.[5]

_____
Zel M. Fischer, Judge

---

[5] But even assuming it was an error, the State, as it did in *McLaughlin*, *Hall*, *Kinder*, and *Griffin*, has overcome the presumption of prejudice.



# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI, )
)
   Respondent, )
)
v. ) No. SC93648
)
ROBERT BLAKE BLURTON, )
)
   Appellant. )

### OPINION CONCURRING IN RESULT

I diverge from the principal opinion's analysis in several aspects. First, I would find that a trial court is required to submit any lesser-included offense requested by a defendant. Second, I would find the trial court failed to instruct the jury on the lesser-included offense of second-degree felony murder when Robert Blake Blurton (hereinafter, "Blurton") requested the instruction and the instruction was supported by evidence presented at trial, but due to Blurton's failure to submit a properly worded instruction or to request the opportunity to modify his instruction, there was no prejudice. Third, there was no need to overrule *State v. Derenzy*, 89 S.W.3d 472 (Mo. banc 2002), *sub silentio*. Accordingly, I concur in result only.

*The trial court is required to instruct on the lesser-included offense*

Blurton's first point on appeal alleges, "The trial court failed to give a lesser-included offense instruction (felony murder) that was supported by the evidence and was

the theory primarily argued by the defense …."  Review of a trial court's decision whether to give a requested jury instruction pursuant to section 556.046, RSMo Supp. 2002,[1] is *de novo*.  *State v. Jackson*, 433 S.W.3d 390, 395 (Mo. banc 2014).  When "the statutory requirements for giving such an instruction are met, a failure to give a requested instruction is reversible error."  *Id*.

Section 556.046.1 sets forth three situations wherein an offense is considered "included" in another offense.  An offense is considered to be a lesser-included offense when:

> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (2) It is specifically denominated by statute as a lesser degree of the offense charged; or
>
> (3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.

Section 556.046.1.

While second-degree felony murder does not meet the traditional "elements test" as set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932), it is denominated specifically as a lesser-included offense by our Missouri legislature.  *State v. Griffin*, 756 S.W.2d 475, 485 (Mo. banc 1988).  Section 565.025.2(l)(a), RSMo 2000,[2] provides that felony murder and conventional second-degree murder are both lesser-included offenses of first-degree murder.  The requirement of section 556.046.1(2) is met.

---

[1] All further references to this section are RSMo Supp. 2002.
[2] All further references to this section are RSMo 2000.

Section 556.046 next contemplates when a trial court is required to instruct a jury on a lesser-included offense. Section 556.046.2 states that the trial court is not required to instruct the jury on a lesser-included offense "unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him [or her] of the included offense." Further, section 556.046.2 provides that a "charged offense" is one that is included in the indictment or information or "is an offense submitted to the jury because there is a basis for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." Here, the state presented evidence that there was missing property from the victims. Accordingly, this subsection is met.

Finally, section 556.046.3 provides the trial court is "obligated to instruct the jury with respect to a particular included offense only if there is a basis in the evidence for acquitting the defendant of the immediately higher included offense and there is a basis in the evidence for convicting the defendant of that particular included offense."

"The decision of what evidence to believe or disbelieve belongs solely to the jury." *State v. Pierce*, 433 S.W.3d 424, 432 (Mo. banc 2014). The trial court "is required to decide what facts a reasonable jury *may find* from the evidence, but it is never permitted to go further and decide what facts the jury *must find*." *Id.* (Emphasis in original). A trial court may not usurp the jury's duty by limiting its inquiry.

Here, the state requested the instructions for first-degree murder and the lesser-included offense of conventional second-degree murder. The trial court accepted both instructions. Thereby, it implicitly recognized there was a basis upon which the jury could acquit Blurton of first-degree murder because it instructed the jury on the lesser-

3

included offense of second-degree murder. Blurton additionally requested the instruction for second-degree felony murder be submitted as a lesser-included offense. Yet, the trial court refused Blurton's request.

There is no prohibition on submitting two lesser-included instructions. It is clear that both conventional second-degree murder and second-degree felony murder may be submitted to the jury as lesser-included offenses of first-degree murder. MAI-CR 3d 314.06 Note 5. The only qualification in submitting all lesser-included instructions is that there must be a basis in the evidence to support the instructions and the instructions are "requested by one of the parties or the court." Section 565.025.3.

In *Jackson* and its progeny, this Court found that any lesser-included offense that meets the traditional "elements test" as set forth in *Blockburger* is a "nested" offense and meets the requirement of section 556.046.1. When reviewing whether the trial court erred in failing to instruct the jury on the lesser-included offense as required by section 556.046.2 and .3, *Jackson* and *Pierce* determined that a trial court commits reversible error in failing to instruct the jury on the lesser-included, "nested" offense. This occurs because if the evidence is sufficient to convict the defendant of the greater charged offense, there is always sufficient evidence to convict the defendant of the lesser-included offense in that the jury may "disbelieve all or any part of the evidence concerning that differential element." *Pierce*, 433 S.W.3d at 430 (citing *Jackson*, 433 S.W.3d at 404-06). Further, this Court stated that a

> defendant not only does not need to introduce affirmative evidence, he [or she] does not have to 'cast doubt' over the state's evidence via cross-examination or explain to the judge or jury precisely how or why the jury

4

> can disbelieve that evidence and so acquit him [or her] of the greater
> offense and convict him [or her] of the lesser.

*Jackson*, 433 S.W.3d at 401-02.

While the lesser-included instruction at issue in this case is not a "nested" instruction, it still is a lesser-included instruction because it has been denominated as such by statute. Rather than ignore our legislators' directive in section 556.046, I would find that the statutory requirements were met and, just as in *Jackson*, find that a trial court is obligated to instruct the jury on a lesser-included offense, provided "there is a basis in the evidence for convicting the defendant of that particular included offense." Section 556.046.3. "Doubts concerning whether to instruct on a lesser-included offense should be resolved in favor of including the instruction, leaving it to the jury to decide." *Jackson*, 433 S.W.3d at 399 (quoting *Derenzy*, 89 S.W.3d at 474-75). Should the jury not believe the defendant, it will convict on the "higher" offense without regard to the lesser-included instruction. Inclusion of a requested, lesser-included instruction that complies with our legislators' mandate in section 556.046 should be given.

Here, the evidence submitted by the state during the trial supported the submission of Blurton's requested second-degree felony murder instruction. To prove felony murder, there must be evidence showing that the homicide occurred during the commission or attempted commission of a felony. *State v. Agee*, 350 S.W.3d 83, 91-92 (Mo. App. S.D. 2011). In this case, the state presented evidence, which may or may not be believed by the jury, that a robbery occurred at the victims' home. Further, the jury may or may not believe that there was an intent to kill as opposed to merely committing a

5

robbery.  Each of these two types of second-degree murder are of equal status, and Blurton was entitled to submit both theories to the jury.  I would find that the trial court erred in failing to submit the requested lesser-included instruction.  While the trial court committed reversible error in failing to submit a requested lesser-included instruction, reversal of the underlying conviction is mandated only when the trial court's error was prejudicial to the defendant.  *State v. Deck*, 303 S.W.3d 527, 548 (Mo. banc 2010).

*Prejudice*

Blurton's proffered lesser-included instruction failed to comply with MAI-CR 3d 323.04 because his instruction did not contain a description of the property that he allegedly took.  "The giving or failure to give an instruction or verdict form in violation of this Rule 28.02 or any applicable Notes On Use shall constitute error, the error's prejudicial effect to be judicially determined …."  Rule 28.02(f).  While the trial court was not required to give an instruction that failed to comply with the MAI, the law is unclear as to whether the trial court should have provided Blurton the opportunity to modify his proffered instruction to comply with the MAI before tendering the instructions to the jury.[3]  However, this point need not be resolved at this time.

Missouri places a "great emphasis on legally correct instructions, and this Court has made it clear that criminal defendants should be freely allowed to argue their contentions arising from the facts."  *State v. Westfall*, 75 S.W.3d 278, 284 (Mo. banc

---

[3] This is especially so in this case as the state's objection was that the instruction was not in the proper form or had the proper accompanying instructions.  There was no specific reference to the failure to comply with MAI-CR 3d 323.04.  Additionally, Blurton did not request, on the record, to modify his proffered instruction in order to comply with the proper form.

6

2002). The presumption of prejudice, which arises from the failure to provide an instruction, can be overcome if the state clearly establishes the error did not result in prejudice. *Id.* "An appellate court will not remand for a new trial on the basis of an error that did not violate a defendant's constitutional rights unless 'there is a reasonable probability that the trial court's error affected the outcome of the trial.'" *Jackson*, 433 S.W.3d at 424 n.4 (quoting *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006)).

I believe that under the circumstances of this case, Blurton was not prejudiced by the trial court's failure to provide an instruction for second-degree felony murder that was predicated upon a robbery because the jury explicitly rejected the facts that would have established the robbery by rejecting those applicable aggravating factors in the penalty phase. Further, Blurton did not request an opportunity to modify his proffered instruction to comply with the MAI. Hence, while it was error to not submit the lesser-included instruction, Blurton is unable to demonstrate he was prejudiced by this error.

Derenzy*'s Validity*

In reaching its result, the principal opinion overruled, by implication, the holding in *Derenzy*, which allowed plain error review of improperly worded jury instructions. *Slip Op.* at 11-2 n.7. I believe the principal opinion overreached in interpreting the intersection between Rule 28 and the holding in *Derenzy*.

*Derenzy* found that because the defendant submitted an incorrect lesser-included offense instruction, the defendant was unable to avail himself of the mandatory review included in Rule 28. *Derenzy*, 89 S.W.3d at 475. *Derenzy* recognizes that, "A trial court does not commit error by rejecting an instruction that either misstates the law or would

7

have confused the jury." *Id*. However, because the defendant could not take advantage of Rule 28 review, he could only receive plain error review to determine whether there was a manifest injustice in failing to instruct the jury on the requested, lesser-included instruction. *Id*. The Court then found that because submitting the requested lesser-included instruction was mandatory and the defendant could have been acquitted on the greater offense, there was plain error in not submitting a proper lesser-included offense instruction. *Id*.

I believe that there is no conflict in *Derenzy* between our general principles of instructional review and Rule 28. *Derenzy* provides clear guidance regarding review of an incorrectly worded, requested, lesser-included instruction. This is the analysis that I believe should be followed and, as detailed in this concurrence, I demonstrated could be used to reach the same result. By the principal opinion's assertion that *Derenzy*'s review provided by Rule 28 is in conflict with the proposition that a trial court does not commit error by submitting an incorrect instruction, the principal opinion overrules *Derenzy sub silentio*.

I believe that as justice requires, this Court should always be able to invoke plain error review as Rule 30.20 allows. There is no need to limit this Court's ability to review errors that result in manifest injustice. Plain error review is discretionary; it is not mandatory review. Rule 30.20; *see also State v. Taylor*, 466 S.W.3d 521, 533 (Mo. banc 2015) and *State v. Collings*, 450 S.W.3d 741, 769 (Mo. banc 2014).

A "decision of this Court should not be lightly overruled." *Eighty Hundred Clayton Corp. v. Dir. of Revenue*, 111 S.W.3d 409, 411 n. 3 (Mo. banc 2003). *Stare*

8

*decisis* "promotes stability in the law by encouraging courts to adhere to precedents." *State v. Honeycutt*, 421 S.W.3d 410, 422 (Mo. banc 2013).

This Court consistently, and recently, has allowed plain error review of instructions "when it is clear that the trial court has so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted." *State v. Hunt*, 451 S.W.3d 251, 260 (Mo. banc 2014) (citing *State v. Ousley*, 419 S.W.3d 65, 75 (Mo. banc 2013)). I would not limit this Court's ability to provide plain error relief when there is a manifest injustice that results in prejudice to a defendant. I see no need to diminish this Court's holding in *Derenzy* in a footnote without further guidance and explanation to future litigants and defendants as to the implications of that decision.

## Conclusion

Accordingly, I concur with the principal opinion in result only.

_____
GEORGE W. DRAPER III, JUDGE