Alok Ahuja, Judge
After a jury trial in the Circuit Court of Cass County, Appellant Roy Vance Hammond was convicted of misdemeanor animal abuse, in violation of § 578.012.[1] Hammond appeals. He argues that the circuit court erred in refusing to allow his attorney to read the Missouri Constitution's "right-to-farm" amendment (Art. I, § 35) to the jury, and in refusing his alternative request that the jury be advised of the amendment in an instruction. Finding no error, we affirm.
Factual Background
On March 29, 2016, Corporal John Sutcliff of the Cass County Sheriff's Office was dispatched to a call that a horse was "down" on Orient Cemetery Road in Cass County. When Corporal Sutcliff arrived, he observed a horse lying in the road, tied to the back of a small pickup truck. The horse was shaking, quivering, and convulsing. Corporal Sutcliff observed Hammond and another man standing nearby.
Corporal Sutcliff observed multiple injuries to the horse's hooves, fetlocks, and the lower portion of its legs. Corporal Sutcliff testified that the sole of the horse's hooves "appeared to be abraded or ground away by some abrasive substance, later determined to be the road surface."
Hammond helped the horse up, and attempted to get it to stand on its hooves. Corporal Sutcliff testified that the horse "prance[d] back and forth" because "[s]he didn't want to keep her feet on ... the surface of the road flat." Instead, the horse "tried to stand on the front surface of her foot ... on her toes, so to speak." Corporal Sutcliff observed blood trickling down the horse's legs. He also noted bloody hoof prints up and down the road.
Deputy Rick Lewis testified that, when he arrived at the scene, he "observed markings in the street indicative of a blood trail," which originated at Hammond's residence, went down the street, and then turned back toward Hammond's home. Deputy Lewis testified that the horse was "sweating profusely," with "blood pooling around her back feet." Although the horse was able to stand, when it did so it shifted its weight back and forth, "which was indicative of significant pain." Deputy Lewis *23 spoke with Hammond at the scene. The deputy testified:
[Hammond] told me that they had been doing farrier stuff to his horses and that this particular horse had broke away from them five times and broke a couple of lead lines, burned some people's hands, and that he was going to teach the horse a lesson.
Given the horse's condition, Corporal Sutcliff was concerned that it would need to be euthanized. He was unable to have a veterinarian respond to the scene, however, and was reluctant to make the decision to euthanize the horse on his own. Corporal Brunner responded to the scene with his personal truck and horse trailer. The horse was able to get up onto its front legs; Corporals Brunner and Sutcliff assisted the horse by locking arms behind its rear hips and lifting it into the trailer. Corporal Brunner then drove the horse to Pleasant Hill Animal Clinic.
Dr. Zachary Patterson, a veterinarian at Pleasant Hill Animal Clinic, testified that he was present when Hammond's horse arrived on March 29, 2016. Dr. Patterson testified that the horse was "sweaty," and "very distressed"; "[h]er breathing was very haggard." Dr. Patterson additionally observed that the horse's hooves were bleeding; it had suffered "frictional injuries" to its hooves, which had exposed the lamina of its rear hooves. Dr. Patterson testified that the injured tissue around the horse's fetlock area "was a texture similar to that of beef jerky." He testified that the injuries were consistent with a frictional injury "not only ... in the rough nature of the injury, but also you can tell that these surfaces had been heated by that friction. So it's almost like a frictional burn." Dr. Patterson testified that, "[t]o me everything points to [the horse] fighting this thing tooth and nail." Based on his evaluation, Dr. Patterson was concerned for the horse's survival. He administered sedatives and pain medication to the horse.
The next day, Dr. Patterson noticed that the horse was suffering from signs of colic - significant abdominal pain which could have multiple causes. Dr. Patterson testified that the colic was likely caused by the trauma experienced by the horse on the previous day. Although Dr. Patterson considered euthanasia, the horse ultimately died on its own.
Hammond was charged by information with felony animal abuse under § 578.012. A jury trial was held on December 15 and 16, 2016.
Hammond called Ron Cook to testify during trial. Cook testified that he had been self-employed for more than fifty years as a farrier (a person who cares for and shoes horses' hooves). Cook was present at Hammond's farm on the day that Hammond was arrested for animal abuse. Cook testified that the injured horse repeatedly broke loose when farm workers attempted to lead it with a rope to the shoeing stock so that Cook could care for its hooves. After multiple failed attempts to lead the horse by hand, Hammond went to retrieve his pickup truck because, according to Cook, there was "[n]o way anybody else was going to pull her." Cook testified that he had previously taught a horse to lead by tying it to an automobile. He testified that "I know a lot of people that have" used the technique.[2]
*24 Cook testified that the horse was tied to the back of the pickup truck with two eight-foot-long ropes. Hammond drove the truck on the chip-and-seal road outside his house because the pasture was too wet at the time. Cook rode in the passenger seat while Hammond drove. Cook testified that the truck had a 5-speed manual transmission, and was placed in a "granny low" gear. Cook testified that the truck was moving so slowly he could have walked alongside it, even though he was using a cane at the time.
Cook testified that it was approximately three-eighths of a mile to the next intersection from Hammond's driveway. Hammond drove the truck up to the intersection and back. Cook testified the horse was "pulling back, jerking, on that blacktop" the entire time. As they were driving up and back, "we had lots of spectators coming by, giving us a bad time." Cook testified that, as they pulled the horse down the road, he commented to Hammond that " '[s]he's trimming her own feet,' " "[b]ecause she was actually doing this, pulling back, jerking, on that blacktop." Cook also testified that, "at some point while [they] were driving up and down Orient Cemetery Road," he told Hammond, " 'I think she's had enough.' " He testified that this comment was "about as much as [he was] willing to do to intervene in a situation when [he was] concerned about an animal being abused," because "it's [Hammond] that's the boss here."[3]
When they returned to Hammond's home (after a circuit of approximately three-quarters of a mile), Cook testified that Hammond applied scarlet oil, a wound care medication, to the horse's back legs, "because they was bleeding a little bit." After applying the scarlet oil, Hammond stated that " 'I think I'll take her one more time.' " As they were driving away from Hammond's house, the horse "tried to pull back and reared up and flopped over." Hammond stopped his truck, and was trying to get the horse up when Corporal Sutcliff arrived at the scene.
Cook was shown photographs of the horse's injuries. Cook claimed that the photographs were of "[s]omething besides the horse that left Vance Hammond's house," because "[t]hat horse didn't have a mark on it when it left the house."
Hammond also testified at trial. He acknowledged that the horse "was constantly fighting, fighting and sliding on her back feet" when he was pulling it with his truck. Hammond testified that he "was watching her in my mirrors and she reared up and then fell down and I stopped immediately"; he testified that "I never drug that horse one inch." Hammond said that he had intended to "get her under control" and never intended to hurt the horse. Hammond testified that he had tied other horses to a motor vehicle to teach them to lead during his fifty years' experience raising horses; he stated that "[i]t's a common practice on a farm ... to get a horse to lead."
Prior to the close of the evidence, Hammond's counsel informed the court that he wished to read to the jury Article I, § 35 of the Missouri Constitution, also known as the "right-to-farm" amendment. Defense counsel argued that he should be permitted to read the amendment because he *25 believed there was evidence that Hammond's treatment of his horse was properly characterized as a "farming or ranching practice." The court denied Hammond's request and ordered that "there shall be no reference to the Constitution, to the right to farm, to Section 35, or to the statute itself." Hammond then requested in the alternative that the court instruct the jury on the right-to-farm amendment. That request was also denied.
During closing argument, Hammond's counsel argued that Hammond had not acted with the purpose of inflicting pain on the horse, but instead for the legitimate purpose of training and controlling the animal. Counsel argued:
[Defense witnesses] Ron Cook and Howard Burbach together have over a hundred years of horse care and treatment and they have testified here for your consideration that using and employing this method of trying to break a horse to lead or get it to lead and follow is something they've done themselves and they've seen other people do. And the jury instruction says that in order to convict Mr. Hammond you have to find that he purposely injured [the horse]. ... If you find that he was acting for another purpose, if you find that Mr. Hammond was acting for some other purpose, then he couldn't have been acting for the purpose of injuring this animal.
....
... The purpose for which Mr. Hammond was acting was not to injure the animal, it was to care and treat it, to discipline it, to cause it to do what had to be done after all.
Counsel told the jury that, in order to decide the case, they needed to "ask [themselves] if his purpose was to hurt this horse or was he acting for some other purpose, to treat it, trim its hooves, to be the owner, the farmer, or the rancher in charge of that horse."
The jury was instructed on the class D felony of animal abuse, and the lesser included offense of class A misdemeanor animal abuse. The jury convicted Mr. Hammond of the misdemeanor offense. The circuit court sentenced him to a one-year term of incarceration in the county jail.
Hammond appeals.
Analysis
Hammond argues that the trial court erred when it refused to allow his counsel to read the right-to-farm amendment, Mo. Const. Art. I., § 35, to the jury, and when it refused to instruct the jury concerning the amendment. Whether viewed as a ruling on the admissibility of evidence or on the scope of counsel's closing argument, or as the refusal of a proffered instruction, we review the circuit court's decision for an abuse of discretion. See State v. Holmsley , 554 S.W.3d 406, 410 (Mo. banc 2018) (control of closing argument); State v. Blurton , 484 S.W.3d 758, 769 (Mo. banc 2016) (evidentiary rulings); State v. Fields , 480 S.W.3d 446, 449 (Mo. App. W.D. 2016) (refusal of requested instruction).
In 2014, Missouri voters approved the adoption of a new Article I, § 35 of the Missouri Constitution, commonly known as the "right-to-farm" amendment. It declares:
That agriculture which provides food, energy, health benefits, and security is the foundation and stabilizing force of Missouri's economy. To protect this vital sector of Missouri's economy, the right of farmers and ranchers to engage in farming and ranching practices shall be forever guaranteed in this state, subject to duly authorized powers, if any, conferred *26 by article VI of the Constitution of Missouri.
In State v. Shanklin , 534 S.W.3d 240 (Mo. banc 2017), a criminal defendant convicted of cultivation of marijuana argued that his conviction was unconstitutional under the right-to-farm amendment. The Supreme Court rejected this argument, and held that the right-to-farm amendment did not have the effect of nullifying long-standing legal restrictions on controlled substances. The Court explained:
The operative clause of article I, section 35 provides "the right of farmers and ranchers to engage in farming and ranching practices shall forever be guaranteed" in order "[t]o protect this vital sector of Missouri's economy," subject to local government regulation as authorized by article VI of the Missouri Constitution. ... The scope of constitutionally protected farming and ranching practices is ... informed by the prefatory clause of article I, section 35, as including those practices that are part of the agricultural sector of Missouri's economy. The amendment includes no language suggesting Missouri voters intended to nullify or curtail longstanding laws regulating or prohibiting possession, cultivation, and harvest of controlled substances. Further, because the amendment expressly recognizes farming and ranching practices are subject to local government regulation, it would be absurd to conclude Missouri voters intended to implicitly nullify or curtail state and federal regulatory authority over the illegal drug trade. The plain, ordinary, and natural meaning of article I, section 35 demonstrates no purpose to sub silentio repeal laws criminalizing the cultivation or possession of controlled substances.
When the General Assembly passed a joint resolution proposing article I, section 35, and Missouri voters adopted it, marijuana cultivation, possession, and distribution had been illegal in Missouri for decades. It necessarily follows that Shanklin's marijuana cultivation operation was not a farming practice to be protected by article I, section 35.
Id. at 242-43 (citations omitted).
What Shanklin said concerning the effect of the right-to-farm amendment on pre-existing controlled substances laws applies equally to the animal abuse statute at issue in this case. Hammond was convicted under § 578.012, which provides in relevant part:
1. A person commits the offense of animal abuse if he or she:
....
(2) Purposely or intentionally causes injury or suffering to an animal. ...
Section 578.012 was enacted in 1983. See S.B. 211, 1983 Mo. Laws 934, 935-36. Predecessor statutes criminalizing animal cruelty had existed in Missouri for over 145 years before § 578.012 was adopted.[4] Significantly, § 578.012 is a law of general application-it does not apply solely to farming or ranching operations, but to all persons in the State, and to abuse directed at livestock, pets, or wild animals. Like in Shanklin , "[t]he [right-to-farm] amendment includes no language suggesting Missouri voters intended to nullify or curtail longstanding laws" of general applicability *27 criminalizing cruelty to, or abuse of, animals. 534 S.W.3d at 242-43 (citation omitted).
We also disagree with Hammond's contention that his prosecution had the effect of criminalizing a legitimate farming or ranching practice. In this case, Hammond was charged with "purposely caus[ing] injury or suffering to a light colored horse." Section 562.016 provides that "[a] person 'acts purposely', or with purpose, with respect to his or her conduct or to a result thereof when it is his or her conscious object to engage in that conduct or to cause that result." Thus, the jury could only have convicted Hammond after finding that, when he pulled the horse behind his pickup truck, Hammond's conscious object was to cause injury or suffering to the horse. Hammond presented evidence, and argued to the jury, that his purpose in pulling the horse behind his truck was not to inflict pain or suffering; instead, his evidence and argument contended that he was employing a legitimate, established farming technique for the purpose of training the horse, and getting it to submit to care by the farrier. By convicting Hammond of animal abuse, the jury found that he committed a purposefully abusive act; this finding demonstrates that the jury rejected Hammond's claim that he was engaging in a legitimate farming practice, to achieve a legitimate farming objective.
In his briefing and at oral argument, Hammond's counsel argued that the animal abuse statute could be employed to prosecute farmers or ranchers for many legitimate activities which may incidentally inflict some measure of pain on livestock: castration of male animals; branding; or the use of spurs, whips, crops, or electric prods to direct an animal's movements. But in each of those cases, the "conscious object" of the farmer or rancher is not to inflict pain or suffering on the animal, but instead to achieve some necessary farming-related objective: preventing unwanted breeding or aggressive behavior; identification of animal ownership; or directing an animal's movements. Any pain or suffering inflicted on the animal is incidental to the farmer's legitimate objectives, and only to the extent necessary to achieve those legitimate objectives. The jury found that Hammond's actions were not of this character.
Because Hammond was prosecuted under a long-standing law of general application, and the definition of the offense excluded conviction on the basis of a legitimate farming or ranching practice, the circuit court did not abuse its discretion when it refused to allow Hammond to read the right-to-farm amendment to the jury, and when it refused to instruct the jury on the amendment's terms.
Conclusion
The judgment of the circuit court is affirmed.
All concur.

Unless otherwise indicated, statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2015 Cumulative Supplement.

Hammond also called another individual experienced with horses, Howard Burbach, who testified that "it's pretty common" to tie a disobedient horse to a motorized vehicle to teach it to follow a human lead. Notably, the veterinarian who testified for the State, Dr. Zachary Patterson, acknowledged that he had learned after this incident that it was "not uncommon" for individuals to tie a horse to a motorized vehicle to train it, "although that's usually something they would do out in the pasture or on a dirt lot, ... not on a paved surface."

More generally, Cook testified that he had witnessed individuals treating their farm animals abusively on other occasions. When asked how he responded, Cook testified that, "I stand back and let them do whatever they want to do, unless it gets completely out of hand and then I'll say something."

See §§ 578.055, 578.060, RSMo 1978; §§ 563.670, 563.680, RSMo 1969; §§ 563.670, 563.680, RSMo 1959; §§ 563.670, 563.680, RSMo 1949; §§ 4557, 4558, RSMo 1939; §§ 4168, 4169, RSMo 1929; §§ 3414, 3415, RSMo 1919; §§ 4627, 4628, RSMo 1909; §§ 1987, 1988, RSMo 1899; §§ 3620, 3621 RSMo 1889; §§ 1374, 1375, RSMo 1879; Ch. 206, § 46, RSMo 1866; Ch. 50, Art. VIII, § 47, RSMo 1855; Ch. 47, Art. VIII, § 38, RSMo 1845; Crimes & Punishments, Art. III, § 54, RSMo 1835.